James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700

Daniel W. Doherty
MACLEAN HOLLOWAY DOHERTY
ARDIFF & MORSE, P.C.
8 Essex Center Drive
Peabody, MA 01960
(978)774-7123

Jay W. Eisenhofer
Linda P. Nussbaum
John D. Radice
Susan R. Schwaiger
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Attorneys for Plaintiffs
WATER LINE SUPPLY LLC and PUBLIC WORKS SUPPLY CO., INC.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WATER LINE SUPPLY, LLC and PUBLIC WORKS SUPPLY CO., INC., Individually and on Behalf of all Others Similarly Situated, <br><br> Plaintiffs, <br> v. <br><br> SIGMA CORPORATION; MCWANE, INC.; and STAR PIPE PRODUCTS, LTD, <br> Defendants. | Civil Action No. _____ <br><br><br><br> **COMPLAINT and** <br> **DEMAND FOR TRIAL BY JURY** |

Plaintiffs, individually and on behalf of a class of all those similarly situated, bring this action for damages under the antitrust laws of the United States against Defendants Sigma Corporation ("Sigma"), McWane, Inc. ("McWane"), and Star Pipe Products, Ltd. ("Star") (collectively, "Defendants") and alleges, based on personal knowledge as to themselves and on information and belief as to all other allegations, as follows:

**Nature of The Case**

1.      This lawsuit is brought as a class action on behalf of all direct purchasers of ductile iron pipe fittings ("DIPF") against DIPF manufacturers Sigma, McWane, and Star.  DIPF are used by water systems to adjust the size and direction of pipes carrying fresh- and waste-water.  This piping is an essential component in water systems and no adequate substitutes exist for such products.

2.      Beginning at least as early as January 2008 and continuing through the present (the "Class Period"), Defendants conspired to fix prices and allocate markets and engage in other anticompetitive conduct concerning DIPF sold in the United States.  Because of Defendants' unlawful conduct, Plaintiffs and other class members paid artificially inflated prices for DIPF and, as a result, have suffered antitrust injury to their business or property.

**Jurisdiction and Venue**

3.      This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the class by reason of the violations, as hereinafter alleged, of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

4.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

5.      Venue is found in this District pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).  Venue is proper in this District because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this District, and because a substantial part of the events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

2

6.      Defendants maintain offices, have agents, transact business, or are found within this District.

## Plaintiffs

7.      Plaintiff Water Line Supply, LLC was at all relevant times a Massachusetts limited liability company with its principal place of business located in North Andover, Massachusetts. During the Class Period, Plaintiff purchased DIPF in the United States directly from one or more of the Defendants.  Plaintiff paid prices for DIPF to Defendants that were, as a result of the conspiracy herein alleged, higher than they otherwise would have been, and as a result of the alleged conspiracy, Plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

8.      Plaintiff Public Works Supply Co., Inc. was at all relevant times a Massachusetts corporation with its principal place of business located in Danvers, Massachusetts.  During the Class Period, Plaintiff purchased DIPF in the United States directly from one or more of the Defendants. Plaintiff paid prices for DIPF to Defendants that were, as a result of the conspiracy herein alleged, higher than they otherwise would have been, and as a result of the alleged conspiracy, Plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

## Defendants

9.      Defendant Sigma is a New Jersey corporation with its principal place of business located at 700 Goldman Drive, Cream Ridge, New Jersey 08514.  Sigma imports, markets and sells DIPF directly to waterworks wholesalers like Plaintiffs and other members of the class.

10.      Defendant McWane is a Delaware corporation with its principal place of business in Birmingham, Alabama.  McWane manufactures, imports, markets and sells DIPF directly to waterworks wholesalers like Plaintiffs and other members of the class.

3

11.     Defendant Star is a limited partnership formed under the laws of the State of Texas with its principal place of business located in Houston, Texas.  Star imports, markets and sells DIPF directly to waterworks wholesalers like Plaintiffs and other members of the class.

12.     Whenever in this Complaint reference is made to any act, deed or transaction of any Defendant, the allegation means that the Defendant engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

**The Market For DIPF**

13.     DIPF are a key component in fresh- and waste-water pipeline systems.  DIPF are used, *inter alia*, to connect other water pipes and outlets, change the direction or flow of water, and to divide the flow of water.

14.     DIPF are unique in their functionality and no widely used substitutes exist for DIPF needs.  No other products substantially constrain the prices of DIPF at competitive levels.

15.     DIPF are largely homogenous, a factor that facilitated Defendants' anticompetitive conduct because purchasers are relatively indifferent about from which manufacturer they buy.

16.     Price fixing and market allocation is especially pernicious within a highly concentrated, fungible market for which adequate substitutes do not exist, as here in the market for DIPF.

17.     Defendants account for the vast majority of DIPF sales in the United States.  As shown in the following graphic, Defendants sell DIPF primarily to waterworks wholesalers like Plaintiffs.  Waterworks wholesalers tend to stock a full line of products so that contractors and municipalities with waterworks needs can find all of their requirements from a single point of sale.

**DIPF Distribution Chain**

DIPF Manufacturers and Distributors
(Defendants)



Waterworks Wholesalers
(Plaintiffs and the proposed Direct
Purchaser Class)



Contractors, Municipalities, and Other
End Users
(Indirect Purchasers)

**Table 1: Yearly Shipments of Ductile Iron Pressure
Pipe and Fittings**

| | (in thousands $) |
|---|---|
| **2004** | 2,047,857 |
| **2005** | 2,206,504 |
| **2006** | 2,416,466 |
| **2007** | 2,455,102 |
| **2008** | 2,500,353 |
| **2009** | 1,453,189 |

18.     Waterworks wholesalers tend to service specific regions of the country, making it easier for Defendants to allocate the market and fix prices, all in violation of the antitrust laws.

19.     The domestic market for DIPF is substantial, with annual sales in recent years of between $1.4 and $2.5 billion.  Table 1 above lists DIPF annual sales from 2004 through 2009.

20.    DIPF sold in the United States are manufactured both domestically and internationally.

21.    Certain waterworks projects require contractors to utilize only DIPF manufactured in the United States, *i.e.*, they contain a "Buy American" provision.  For those projects, DIPF manufactured internationally is not fungible with DIPF manufactured in the United States.  For projects that do not have such requirements, DIPF are fungible, regardless of where they were manufactured.

22.    During the Class Period, all Defendants imported internationally manufactured DIPF which they then sold to Plaintiffs and the Class.

23.    Until 2009, Defendant McWane was the only large seller of domestically manufactured DIPF and controlled nearly 100 percent of the market for those projects for which domestically produced DIPF are required.  Together, Defendants controlled more than 90 percent of all DIPF sales in 2008, when the anticompetitive conduct began.  This high market concentration facilitated Defendants' anticompetitive scheme.

24.    Substantial barriers to entry exist for new DIPF suppliers hoping to break into the market, which further aided Defendants' anticompetitive scheme.  Developing and outfitting new facilities to produce DIPF is a capital-intensive endeavor and new entrants would need to make substantial investments before realizing their first bit of revenue.  Manufacturers also typically sell a full line of products so a new entrant would need to produce a full line of DIPF to be able to compete effectively or risk being shut out, as was done by Defendants Sigma and McWane here.

25.    The pricing structure of DIPF also facilitated Defendants' anticompetitive scheme.  DIPF are sold via published price lists, sometimes with discounts from those prices.  In addition, demand for DIPF is relatively inelastic at competitive prices.

**Defendants' Anticompetitive Conduct**

26.     Defendants began their conspiracy at least as early as January 2008 by entering into a horizontal price fixing conspiracy, the type of agreement that courts have found to be per se illegal for more than a century.

27.     Defendants were concerned that rising materials costs would diminish their profits but at the same time each feared that a unilateral price hike would lead to a loss of market share to its competitors.

28.     Defendants recognized that coordinated action could solve this problem and, in January 2008, all agreed to take coordinated price hikes.  Defendants also agreed to limit the discounting off of published prices that some manufactures offered to some customers.

29.     Defendant McWane took the first price hike in January 2008, and the other Defendants executed their agreed-upon price hikes soon thereafter.  In the middle of 2008, Defendants took another coordinated price hike on DIPF.

30.     Defendants policed their anticompetitive agreement to fix prices through an organization called the Ductile Iron Fittings Research Association ("DIFRA") and through public letters that telegraphed each of their pricing and compliance with the agreed-upon conspiracy.

31.     The DIFRA served as an information exchange that allowed each Defendant to monitor in near-real-time proprietary sales data from their competitors.  Such data typically is treated as highly confidential because publication of such data would allow competitors to slightly under-bid and steal market share.  However, given Defendants' agreement, this data was shared precisely to show that Defendants were sticking to their agreed price increases and were not competing – as would normally happen – to gain market share.

32.     Defendants' conspiracy to fix prices for DIPF and cause Plaintiffs and the Class to pay supracompetitive prices for their DIPF needs continued through at least early 2009.

33.     In February 2009, Congress passed and the President signed a stimulus package called the American Recovery and Reinvestment Act of 2009, Pub. L. 111-5 (the "ARRA").  Among other things, the ARRA provided substantial funds – over $6 billion – for waterworks projects.

34.     The ARRA contained a Buy American provision for waterworks projects that it funded.  Given its size, the ARRA created a substantial expansion in the demand for domestically produced DIPF.

35.     At the time of the enactment of the ARRA, only Defendant McWane produced and distributed substantial quantities of domestically made DIPF.

36.     The other Defendants realized that the ARRA created a huge new opportunity and began working to manufacture domestically made DIPF.  Normally, this type of competition would lead to lower prices for consumers and expanded output for the economy.

37.     However, Defendants Sigma and McWane also recognized that they could achieve even greater profitability by refraining from competing to sell domestically made DIPF and instead decided to unlawfully perpetuate McWane's monopoly in that market and share those monopoly rents.

38.     Prior to reaching this agreement, Defendant Sigma had taken concrete steps to participate in the manufacture of domestically made DIPF.  Among other things, Defendant Sigma created an operational plan; cast prototype molds; arranged for financing for new production facilities; and obtained Board approval for its plans.

39.     Despite all of this work, Defendant Sigma then abandoned its plans to compete in favor of the attraction of splitting sure monopoly profits with Defendant McWane.

8

40.    In September 2009, Defendants Sigma and McWane entered into a Master Distribution Agreement ("MDA") that governed their split of sales of domestically made DIPF. The MDA and related agreements provided, *inter alia*, that Sigma would abandon its well-developed plans to launch its own line of domestically made DIPF and would instead act as a distributor for McWane's domestically made DIPF. Both Defendants would sell at similar prices and would limit discounting so as to maintain the monopoly and not engage in competition that would drive down their prices and their profits. McWane directly controlled Sigma's prices and was therefore able to dictate pricing for the entire market.

41.    Defendants Sigma and McWane buttressed their September 2009 agreement with additional anticompetitive terms to exclude other potential rivals. They agreed that Sigma would only sell domestically made DIPF produced by McWane. They also forced waterworks wholesalers to agree to purchase domestically made DIPF only from Sigma or McWane or else those wholesalers would face penalty pricing from Sigma and McWane. These exclusive dealing terms succeeded in shutting out new potential entrants.

42.    The September 2009 agreement severely hamstrung Star's attempt to enter the market and sell its own domestically made DIPF. Star had not previously produced domestically made DIPF and could not hope to enter the market with as full of a product line as Defendants Sigma and McWane. Therefore, even wholesalers who wanted to purchase some of their domestically made DIPF needs from Star still faced the daunting prospect of needing to pay substantially higher penalty prices to Sigma and McWane as those wholesalers completed purchasing the full product line. Confronted with this calculus, many wholesalers decided to keep purchasing from Sigma and McWane instead of purchasing, as they desired, from new-entrant Star even if Star offered lower

prices.  The September 2009 agreement allowed Sigma and McWane to dominate the market and disadvantage new entrants and direct purchasers like Plaintiffs and the Class.

43.     The September 2009 agreement benefited Defendants Sigma and McWane, as they intended, by allowing them to maintain and share monopoly profits in a substantially larger market. Purchasers, like Plaintiffs and the Class, were left footing the bill for higher prices.

44.     The following figure shows the distortion of prices that Defendants' anticompetitive conduct caused.  First, the January 2008 agreement among all Defendants to fix prices caused a sharp – over fifty percent – increase in DIPF producer price index ("PPI") at the same time that overall PPI grew far less – only by approximately ten percent.  The DIPF PPI shows a marked decline between the time when this activity abated and when Defendants Sigma and McWane moved on to their follow-up anticompetitive behavior in mid-2009.  At that time, one again sees a substantial increase in DIPF PPI at the same time that overall PPI is unchanged or at most only modestly higher.



10

## Government Antitrust Investigation

45.     In January 2012 the Federal Trade Commission ("FTC") filed a complaint and consent decree against Defendant Sigma and filed a separate but related complaint against Defendants McWane and Star detailing Defendants' anticompetitive conduct.  Prior to issuing a complaint the FTC must have a "reason to believe" that a violation has occurred and a proceeding to remedy that violation is in the public interest.  *See* 15 U.S.C. § 45(b).  Therefore, the FTC had a "reason to believe" that Defendants had been using an unfair method of competition or unfair or deceptive act or practice in or affecting DIPF commerce.

46.     At the same time that it announced its complaint against Defendant Sigma, the FTC announced a proposed settlement with Sigma "designed to remedy its allegedly anticompetitive tactics."  Among other things, the proposed settlement prohibits Sigma from engaging in a further conspiracy to restrain trade, fix prices, or allocate markets for DIPF.  Sigma also agreed to refrain from sharing commercially sensitive competitive information with its competitors and to not invite any competitor to engage in anticompetitive conduct.

## Class Action Allegations

47.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Fed.R.Civ.P. 23(a) and (b)(2) and (b)(3) on behalf of all members of the following class:

> All persons (excluding Defendants, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing) who purchased DIPF in the United States directly from any of the Defendants, or any present or former parent, subsidiary or affiliate thereof, at any time during the period from at least January 2008 or earlier until the effects of Defendants' anticompetitive conduct cease.

48.     Plaintiffs believe that there are hundreds of class members as above described, the exact number and their identities being known by Defendants.

49.     The class is so numerous and geographically dispersed that joinder of all members is impracticable.

50.     There are questions of law and fact common to the class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.     Whether Defendants engaged in a combination and conspiracy among themselves to allocate the market for or engage in other anticompetitive conduct concerning DIPF sold in the United States;

b.     The identity of the participants in the conspiracy;

c.     The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

d.     Whether the alleged conspiracy violated Sections 1 and/or 2 of the Sherman Act;

e.     Whether the conduct of Defendants caused injury to the business and property of Plaintiffs and other members of the class;

f.     The effect of Defendants' anticompetitive conduct on the prices of DIPF sold in the United States; and

g.     The appropriate measure of damages sustained by Plaintiffs and other members of the class.

51.     Plaintiffs are members of the class.  Plaintiffs' claims are typical of the claims of the class members, and Plaintiffs will fairly and adequately protect the interests of the members of the class.  Plaintiffs are direct purchasers of DIPF and their interests are coincident with and not antagonistic to those of the other members of the class.  In addition, Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

52.     The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications.

53.     Defendants have acted, and refused to act, on grounds generally applicable to the class.

54.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

55.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The class is readily definable and is one for which records should exist in Defendants' files.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

**Trade and Commerce**

56.     The activities of Defendants, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

57.     During the time period covered by this Complaint, Defendants marketed and sold DIPF throughout the United States.

58.     Defendants, and each of them, have used instrumentalities of interstate commerce to market and sell DIPF.

59.     Defendants have marketed and sold DIPF in a continuous and uninterrupted flow of interstate commerce.

**Fraudulent Concealment**

60.     Plaintiffs had no knowledge of Defendants' unlawful self-concealing conspiracy and could not have discovered the contract, combination or conspiracy until January 2012 by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy.

61.     Because the contract, combination or conspiracy was kept secret by Defendants, Plaintiffs were unaware of the anticompetitive conduct concerning of DIPF that were secretly agreed upon as alleged herein.  It was not until January 2012, when the FTC announced a settlement with Defendant Sigma and a Complaint against Defendants McWane and Star, that Plaintiffs became aware, or could have become aware with the exercise of reasonable diligence, of Defendants' anticompetitive conduct.

62.     As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations affecting the right of action by Plaintiffs.

14

## COUNT I
### (Against All Defendants)
### (Unlawful Price Setting in Violation of Sherman Act § 1, 15 U.S.C. § 1)

63.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     Defendants' unlawful conduct resulted in artificially high supra-competitive prices charged by Defendants to Plaintiffs and the members of the class for DIPF.

65.     Plaintiffs and members of the class had to pay more for DIPF than they would have paid in a competitive marketplace, unfettered by Defendants' collusive and unlawful price-fixing.

66.     Plaintiffs seek to recover for these overcharge damages.

67.     As a direct and proximate result of Defendants' scheme, Plaintiffs and the members of the class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined.  Plaintiffs' injuries consist of paying higher prices to purchase DIPF than it would have paid absent Defendants' conduct.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendant's conduct unlawful.

## COUNT II
### (Against Defendants Sigma and McWane)
### (Unlawful Monopolization in Violation of Sherman Act § 2, 15 U.S.C. § 2)

68.     Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

69.     Defendants Sigma and McWane acquired, willfully maintained and unlawfully exercised monopoly power in the relevant market through the exclusionary, anticompetitive conduct set forth above, including, by threatening direct purchasers if they purchased domestically produced DIPF from manufacturers other than Defendants Sigma and McWane.

70.     Defendants Sigma and McWane effectively excluded competition from a significant portion of the relevant market, unlawfully acquired and expanded their dominant market share in the relevant market, and profited from their anticompetitive conduct by maintaining prices at artificially high levels and by otherwise reaping the benefits of its illegally obtained and maintained monopoly power.

71.     There is no legitimate business justification for Sigma's and McWane's anticompetitive actions and the conduct through which they acquired and maintained monopoly power in the relevant market.  The anticompetitive effects of their conduct far outweigh any conceivable pro-competitive benefit or justification and any possible pro-competitive benefits could have been obtained by less restrictive alternatives.

72.     Sigma's and McWane's unlawful conduct resulted in artificially high supra-competitive prices charged by Defendants to Plaintiffs and the members of the class for DIPF.

73.     Plaintiffs seek to recover for these overcharge damages.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Sigma's and McWane's conduct unlawful.

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.     That the conduct, contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have been in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2.

C.      That judgment be entered for Plaintiffs and members of the class against Defendants

for three times the amount of damages sustained by Plaintiffs and the class as allowed by law,

together with the costs of this action, including reasonable attorneys' fees.

D.      That Plaintiffs and members of the class have such other, further and different relief

as the case may require and the Court may deem just and proper under the circumstances.

<div style="margin-left: 50%;">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
 Attorneys for Plaintiffs


By:____/s/ James E. Cecchi_____
        JAMES E. CECCHI

</div>

Dated: February 9, 2012

Jay W. Eisenhofer
Linda P. Nussbaum
John D. Radice
Susan R. Schwaiger
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Daniel W. Doherty
MACLEAN HOLLOWAY DOHERTY ARDIFF & MORSE, P.C.
8 Essex Center Drive
Peabody, MA 01960
(978)774-7123

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury of all as to all issues so triable.

> CARELLA, BYRNE, CECCHI,
> OLSTEIN, BRODY & AGNELLO, P.C.
>  Attorneys for Plaintiffs
>
>
> By:   /s/ James E. Cecchi
>         JAMES E. CECCHI

Dated: February 9, 2012

Jay W. Eisenhofer
Linda P. Nussbaum
John D. Radice
Susan R. Schwaiger
GRANT & EISENHOFER, P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
(646) 722-8500

Daniel W. Doherty
MACLEAN HOLLOWAY DOHERTY ARDIFF & MORSE, P.C.
8 Essex Center Drive
Peabody, MA 01960
(978)774-7123